UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

*ex rel.*

FOX UNLIMITED ENTERPRISES, LLP

                              Plaintiff/Relator,

       v.

TRIMARK USA, LLC, TRIMARK GILL
GROUP, TRIMARK GILL MARKETING
F/K/A GILL MARKETING, INC.
GOVERNMENT SALES, LLC
F/K/A GOVERNMENT SALES, INC.,
JOHN DOES #1-50, FICTITIOUS NAMES,

                           Defendants.



**COMPLAINT**

**CONFIDENTIAL**
**FILED UNDER SEAL**

Civ. No.: 1:19-cv-914
(GLS/cFH)

**JURY TRIAL DEMANDED**

**HODGSON RUSS LLP**
*Attorneys for Plaintiff/Relator*
Daniel C. Oliverio
Michelle L. Merola
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Tel. No.: 716.856.4000

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT AND NATURE OF THE ACTION ..............................1

II.     JURISDICTION AND VENUE ..................................................................................4

III.    PARTIES .........................................................................................................................5

        A.      Plaintiff/Relator........................................................................................... 5

        B.      Defendants .................................................................................................... 5

                1.      TriMark USA, LLC ........................................................................ 5

                2.      TriMark Gill Group........................................................................ 6

                3.      TriMark Gill Marketing ................................................................. 6

                4.      Government Sales, LLC................................................................. 6

                5.      John Does Nos. 1-50, Fictitious Names......................................... 6

IV.     REGULATORY BACKGROUND .................................................................................7

        A.      Federal Small Business Subcontracting....................................................... 9

                1.      Certification Requirements .......................................................... 11

                2.      Affiliation Principles for Small Businesses ................................. 13

        B.      The "Presumed Loss Rule" Under the Small Business Act of 2010 ................... 14

        C.      The False Claims Act.................................................................................. 15

        D.      The Anti-Kickback Act of 1986 ................................................................ 17

V.      DEFENDANTS'S FRAUDULENT CONDUCT..........................................................19

        A.      TriMark Uses Small Businesses as Illegal Pass-Throughs .................................. 19

                1.      TriMark's Fraudulent Scheme – An Overview ......................... 20

                2.      TriMark's Fraudulent Scheme – A Plan in Action .................... 22

        B.      GSI Is Affiliated with TriMark and Thus Is not an Eligible Small Business ....... 24

VI.     DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO
        FEDERAL PROGRAMS ..............................................................................................29

VII.    DEFENDANTS IMPROPERLY SOLICITED/PAID /RECEIVED KICKBACKS
        IN VIOLATION OF THE AKA....................................................................................31

VIII.   DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO
        DEFRAUD THE UNITED STATES ............................................................................32

        COUNT I  (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ........................ 33
        COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ......................... 34

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))......................... 35

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ........................ 35

IX.    PRAYER FOR RELIEF ..................................................................................................36

X.    JURY TRIAL DEMAND ................................................................................................37

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729

This is an action brought on behalf of the United States of America by Relator Fox Unlimited Enterprises, LLP, by and through its attorneys, against Defendant TriMark USA, LLC, TriMark Gill Group, TriMark Gill Marketing f/k/a Gill Marketing, Inc. (collectively "TriMark"), Government Sales, LLC f/k/a Government Sales, Inc. (collectively "GSI") and John Does #1-50, Fictitious Names, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").

## I.    PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.    This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and claims that Defendants knowingly presented, or caused to be presented, to the United States and its agents and intermediaries in violation of the FCA.

2.    At issue in this case is Defendants' fraudulent course of conduct that caused various federal agencies, including the United States Department of Defense, and the Department of Veterans Affairs, to award tens of millions of dollars in contracts that were set aside for performance by eligible small businesses.

3.    The fraudulent conduct at issue arises from Defendant TriMark—a large business under the relevant Small Business Administration ("SBA") size standards—conspiring to use the small business classifications of multiple small businesses as part of a vast and illegal pass-through scheme. The pass-through scheme allowed TriMark to fraudulently obtain access to millions of dollars in small business contracts, which were ultimately fulfilled by TriMark.

4.    TriMark used its considerable resources as a large business and decades-long experience in government contracting to manipulate many of these small businesses into (literally) doing its bidding. For example, TriMark dissuaded small businesses from having their own

1

lawyers review subcontracting terms, insisting that it would be in everyone's best interests "as long as we can keep attorneys out of this." TriMark also combines its long-standing reputation in the industry with offers of "exclusive" contracting arrangements to small businesses as incentives to not question the propriety of such arrangements.

5.   And when it comes time to identify which small business opportunity to pursue, determine the pricing submitted to the government, and decide how and when to perform under an awarded contract, TriMark maintains tight control over every aspect of the process.

6.   Despite its large business size status, TriMark monitors all newly announced small business solicitations to identify opportunities it intends to fulfill itself. Once TriMark selects a solicitation set aside for small businesses, it reaches out to a business that possesses the specific small business classification identified in the procurement. TriMark then drafts the quote— specifically identifying the price and establishing all other terms— and sends it to the small business. TriMark instructs the small business to remove any reference in the quote to TriMark, place the quote on the small business's letterhead, and email the quote directly to the government agency, blind copying a TriMark representative on the submission. If successful, the small business earns a pittance for doing what TriMark refers to as "flipping the bid."

7.   Defendants made and caused to be made numerous materially false statements and certifications to the government. For example, despite knowing that these small businesses were merely pass-throughs that were not actually performing any material work on these contracts, Defendants knowingly conspired to have the small businesses obtain government contracts set aside for eligible small businesses ("SB"), historically underutilized business zone firms ("HUBZone"), and service-disabled veteran owned small business ("SDVOSB") entities and pass the contracts on to TriMark for fulfillment.

8.     By diverting contracts and benefits therefrom intended for SB, HUBZone or SDVOSB eligible firms towards TriMark—an ineligible company—Defendants undercut the purpose of statutorily-created programs to encourage contract awards to legitimate SB, HUBZone and SDVOSB firms. The United States did not receive the intended benefits of a SB, HUBZone and/or SDVOSB firm receiving and performing the federal contracts.

9.     These wrongful actions further induced or resulted in the government's inappropriate award of these contracts and payment of millions of dollars on these federal contracts.  Defendants, therefore, are liable to the United States under the FCA for treble damages and civil penalties as permitted by law.

10.     Defendants agreed to enter into this scheme to present these false claims and statements to the United States, and these false claims and statements were made in furtherance of conspiracies to defraud the United States.  The purpose of the scheme has, at all relevant times, been to receive payment under false pretenses for claims submitted to the United States.

11.     As a result of these false certifications, reports, and claims, the government was falsely and/or fraudulently induced to conduct hundreds of transactions with Defendants.  Because the United States was falsely and/or fraudulently induced to complete these transactions with Defendants, each claim for payment under the contracts was a false claim.

12.     TriMark's payment of illegal "small business" fees for "flipping the bid" also violated the terms of the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8701–8708, by providing and/or receiving any "thing of value . . . that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract."  *Id.* § 8701(2).

13.     In addition, Defendant GSI does not and has not qualified as a small business because it was affiliated, pursuant to SBA regulations, with TriMark through common management, common ownership and the totality of the circumstances, and the aggregated size of the companies has at all times exceeded the relevant employee count thresholds.

14.     GSI operates largely as a pass-through entity in which it bids on government contracts set aside for small businesses at TriMark's behest because TriMark is not a small business nor is it eligible for contracts set aside for small businesses.

15.     Among other misconduct, Defendants conspired amongst themselves as well as with numerous co-conspirators to deceive the government.

16.     As a result of these false certifications, the government was falsely and/or fraudulently induced to award Defendants upwards of $100 million dollars for government contract opportunities specifically reserved for legitimate small businesses.

17.     Accordingly, Relator, on behalf of the United States, and pursuant to the FCA, seeks all applicable damages and penalties from Defendants for knowingly submitting false claims.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over claims brought on behalf of the United States under the FCA, pursuant to 31 U.S.C. §§ 3730, 3732.

19.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

20.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because acts that form the basis of this Complaint occurred in this judicial district, including government contracts that were fulfilled at the Stratton VA Medical Center in Albany.

21.    The causes of action alleged herein are timely brought because of, among other things, efforts by Defendants to conceal their wrongdoing.

## III.    PARTIES

### A.    PLAINTIFF/RELATOR

22.    Relator/Plaintiff Fox Unlimited Enterprises, LLP, a Delaware limited liability partnership, brings this action on behalf of itself and the United States of America. The registered office of the Relator is 28 Old Rudnick Lane in Dover, Delaware 19901, and the name of the registered agent at such address is URS Agents, LLC.

23.    Pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, Fox Unlimited Enterprises, LLP is not distinct from its partners, at least one of whom has personal knowledge of the false claims, statements, and concealments alleged herein.

24.    Relator has direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation based on its experience and knowledge to uncover and report the fraud alleged herein.

25.    Accordingly, Relator is the "original source" of the non-public information alleged in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A)–(B).

26.    Prior to the filing of this Complaint, Relator provided the government with written disclosure of substantially all material evidence and information that Relator possessed, in accordance with 31 U.S.C. § 3730(b)(2).

### B.    DEFENDANTS

#### 1.    TriMark USA, LLC

27.    Defendant TriMark USA, LLC ("TriMark") is a Massachusetts corporation with its principal place of business at 505 Collins Street in South Attleboro, Massachusetts 02703.

### 2.    TriMark Gill Group

28.    TriMark Gill Group ("Gill Group") is a Maryland corporation with its principal place of business at 2128 Espey Court #1 in Crofton, Maryland 21114.   Formerly known as Gill Group Inc., the company was originally founded in 1973.  As of August 1, 2007, Gill Group operates as a subsidiary of TriMark.

### 3.    TriMark Gill Marketing

29.    Defendant TriMark Gill Marketing ("Gill Marketing") is an Arizona corporation with its principal place of business at 1904 West Parkside Lane, Phoenix, Arizona 85027. Formerly known as Gill Marketing, Inc., the company was a division of Gill Group, which was originally founded in 1973. As of August 1, 2007, Gill Marketing operates as a subsidiary of TriMark.

### 4.    Government Sales, LLC

30.    Defendant Government Sales, LLC formerly known as Government Sales, Inc. (collectively "GSI") is a North Carolina corporation with its principal place of business at 4644 Arendell Street in Morehead City, North Carolina 28557.  The key principals for GSI, including Charles Robinson and Kimberly Barr, formerly held positions at Gill Marketing.

### 5.    John Does Nos. 1-50, Fictitious Names

31.    John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme alleged herein.

32.    To the extent that any of the conduct or activities described in this Complaint was not performed by Defendants, but by the individuals or entities alleged herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such

circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme alleged herein.

33.   As a result of Defendants' actions, the United States has suffered significant financial harm.

34.   Defendants' conduct is ongoing.

## IV.   REGULATORY BACKGROUND

35.   The government is the world's largest buyer of services and goods.  Purchases by military and civilian agencies amount to nearly $600 billion a year and include everything from complex space vehicles to the paving of parking lots.

36.   The General Services Administration ("GSA") was created pursuant to the Federal Property and Administrative Services Act of 1949 to consolidate agency service activities, including purchasing supplies and equipment for Federal agencies.  GSA created the Federal Supply Schedule program, commonly referred to as the Multiple Award Schedule ("MAS").

37.   The MAS program provides agencies with a simplified process of acquiring commercial supplies and services in varying quantities while obtaining volume discounts. Under the program, indefinite-delivery/indefinite-quantity ("IDIQ") contracts are awarded to various contractors allowing them to provide identified supplies and/or services at stated prices and subject to pre-negotiated terms and conditions. FAR § 38.101(a). Once GSA issues a vendor a MAS contract, a buying agency may simply order directly from the vendor.

38.   The Federal Supply Schedule is divided into several schedules, each of which is a vehicle to buy and sell a certain type of product.  For example, the procurements at issue in this case are generally found on Schedule 73, which is devoted to "Food Service, Hospitality, and Cleaning." Vendors that wish to offer supplies and services to the United States Government

through the General Services Administration must apply and obtain a schedule contract under Schedule 73. *See* FAR Subpart 38.1 – Federal Supply Schedule Program.

39.    The GSA negotiates each vendor schedule contract and attempts to achieve an agreement that achieves the best value for the U.S. Government. The GSA also requires that all of its vendor schedule contracts comply with U.S. Government regulations, policies, and procurement objectives.

40.    Since November 2, 2011, agencies have been able to set aside orders issued under the MAS program for small business concerns, including RFQs posted on e-Buy. Such postings are to include a label identifying what kind of a set-aside the RFQ is and language stating that quotes from Schedule contractors who are not eligible for the set-aside will not be considered for award.

41.    Small businesses "self-certify" that they are small by going to the Small Business Administration's website (https://www.sba.gov) and verifying that their business meets "size requirements." Then they would register to do business with the federal government by registering on SAM.gov. If a business self-certifies as "small" it can take advantage of contracting opportunities set-aside, or earmarked, for small businesses.

42.    Defendants are entities that have entered into vendor schedule contracts with the GSA to provide products to the U.S. Government.  Therefore, they have certified compliance with applicable laws and regulations.  Defendant GSI falsely certified both to the GSA and to Government customers that it was a small business.

43.    GSI has received thousands of transactions from various federal agencies due to their purported small business status utilizing its GSA Schedule 73. The total value of those actions, including the base and all options, is worth tens of millions of dollars.

## A.   FEDERAL SMALL BUSINESS SUBCONTRACTING

44.   The Small Business Act encourages prime contractors to award subcontracts to small companies, including those with various special socioeconomic designations recognized by the SBA, so that they will have the "maximum practicable opportunity to participate in the performance" of Federal contracts.  Section 2 of the Small Business Act states:

> The essence of the American economic system of private enterprise is free competition.  Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured.  The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation.  Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed.  It is the declared policy of the Congress that the government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631(a).

45.   The Small Business Act provides that in order to be considered a small business, an entity must be independently owned and operated and not dominant in its field.  *Id.* § 632(a)(1).

46.   Section 632 also authorizes the SBA to promulgate more specific standards by which a business may be deemed a small business concern.  Pursuant to that authority, the SBA has issued specific size standards that determine whether a business qualifies as a small business concern.

47.   A Small Business "size standard" is numerical and represents the largest a concern can be and still be considered a small business.  *See* 13 C.F.R. §§ 121.101–102.

48.   The SBA uses one of two measures to determine whether a company is considered small.  The industry in which a company performs its work determines which measure applies.  Some industries use annual receipts, while others use employee count.  13 C.F.R. § 121.101.

9

49.     The majority of the transactions at issue in this Complaint use an employee count size standard.  As applicable in this action, a company is considered "small" if it has fewer than a specified number of employees.  This is called the "size standard."  13 C.F.R. §§ 121.101; 121.106(b)(1).

50.     The size standard varies based on the specific contract the company is bidding on; thus, a company could be considered a small business for some contracts but not others.  Contract solicitations issued by government agencies contain a North American Industry Classification System code or "NAICS code."  NAICS codes are numeric designations that divide economic activity into discrete sectors and subsectors for the purpose of classifying what goods and services businesses provide.  Each NAICS code is associated with a particular size standard (either employee count or annual receipts).  13 C.F.R. § 121.402(a)

51.     The SBA size standard limitation to qualify as a "Small Business Concern" for businesses in the food service equipment subsector, is 500 employees. *See* U.S. Small Bus. Admin., Table of Small Business Size Standards Matched to North American Industry Classification System Codes 6 (Feb. 26, 2016), *available at* http://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf (last visited July 31, 2018); *see also* 13 C.F.R. § 121.201.

52.     The number of employees a company has is determined based on the average number of employees for the preceding twelve calendar months. 13 C.F.R. § 121.106(b)(1). Full-time, part-time, and temporary employees are all counted as "employees" for size purposes. 13 C.F.R. § 121.106(a).  In determining the size of the company, the government counts all employees of that company as well as all employees of the company's "affiliates."  13 C.F.R. § 121.106(b)(1).

53.    SBA regulations include a multi-factor test for affiliation.  In general, "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both.  It does not matter whether control is exercised, so long as the power to control exists." 13 C.F.R. § 121.103(a)(1) (2007).  Affiliation may be determined based on "factors such as ownership, management, previous relationships with or ties to another [business] concern, and contractual relationships[.]"  *Id.* § 121.103(a)(2).  Affiliation can also be found "where an individual, concern, or entity exercises control directly or indirectly through a third party."  *Id.* § 121.103(a)(4).  Affiliation is determined based on the "totality of the circumstances."  *Id.* § 121.103(a)(5).

54.    The regulations also include a number of specific tests for affiliation.  A person or company is deemed to control a concern when the person owns, or has the power to control, 50 percent or more of a concern's voting stock, 13 C.F.R. § 121.103(c)(1), such that two businesses are affiliated when a person or entity has 50 percent or more of the voting stock of each business.  Affiliation also arises "where one or more officers, directors, managing members, or partners who control the board of directors and/or management of one concern also control the board of directors or management of one or more other concerns."  *Id.* § 121.103(e).

### 1.    Certification Requirements

55.    Contractors must complete annual electronic representations and self-certifications in the System for Award Management ("SAM") database—a Government-owned and operated website used by businesses who register to do business with the government.

56.    Contractors are required to update the representations and certifications submitted to SAM as necessary, but at least annually, to ensure that they are kept current, accurate, and complete.

57.     The representations and self-certifications are effective for one year from the date of submission or update to SAM.  Pursuant to FAR § 52.212-3, contractors represent whether they meet the status requirements for various small business categories.

58.     For the purposes of federal procurement programs for which status as a small business is required, a concern must not exceed the size standard under the applicable NAICS code specified in the solicitation, whether the threshold is based upon number of employees or annual revenues. 13 C.F.R. §§ 121.401–121.413.

59.     Each NAICS industry code has a corresponding size standard, and the table is published annually in the Federal Register. *Id.* § 121.101.

60.     Both submissions of bids set aside for small businesses and registrations in the SAM.gov database for the purpose of being considered for an award as a small business concern are deemed "affirmative, willful and intentional certifications of small business size and status." 15 U.S.C. § 632(w)(2).

61.     Each time a business enters into a set-aside contract with the government and each time it files its annual SAM.gov certification, it becomes subject to a stiff sanctions regime intended to deter small business fraud.

62.     In addition to other laws that may be applicable, section 16(d) of the Small Business Act provides severe criminal penalties for knowingly misrepresenting the small business size status of a concern in connection with procurement programs. 15 U.S.C. § 645(d).

63.     Section 16(a) of the Act also provides, in part, for criminal penalties for knowingly making false statements or misrepresentations to SBA for influencing in any way the actions of the Agency.  15 U.S.C. § 645(a); see also 13 C.F.R. § 121.108.

64.     These and other penalties are set forth in the certifications made by each business concern bidding under a small business set-aside: "any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act." 15 U.S.C. § 645(d).

### 2.     Affiliation Principles for Small Businesses

65.     The affiliation concept is important to government contractors because it can have a significant impact on whether a business is deemed large or small.  Small businesses are eligible to participate in numerous beneficial government programs.  The SBA determines the size of a business by examining a company's average annual revenue or number of employees.  When two companies are affiliated, the SBA combines the revenue or number of employees of both companies.  Thus, each company is less likely to fall below the SBA's applicable limit and is less likely to be eligible for preferred contracting status.

66.     "Affiliation" exists between businesses when one business, directly or indirectly, controls or has the power to control another business, or when a third party, directly or indirectly, controls or has the power to control both businesses. See 13 C.F.R. § 121.103(a); FAR § 19.101; U.S. Small Bus. Admin., A Handbook for Small Business Liaison Officers ("SBLO Handbook") 16          (June          2010),          *available*          *at* https://www.sba.gov/sites/default/files/articles/Small_Business_Liaison_Officer_(SBLO)_Hando ook_6_2010.pdf.  Control may arise through ownership, management, or other relationships or interactions between the parties. See 13 C.F.R. § 121.103(a).  If one or more officers, directors,

managing members, or general partners of a business control the Board of Directors and/or the management of another business, the businesses are affiliates. *See id.* § 121.103(e).

67.     The ostensible subcontractor rule prohibits a small business contractor from being unusually reliant upon its subcontractor, or a subcontractor to perform primary or vital responsibilities of the contract. *Id.* § 121.104(h)(4). The rule is intended to prevent other than small firms from forming relationships with small firms to evade SBA's size requirements.

68.     In determining a violation of this rule, the SBA considers all aspects of the relationship, including the terms of the proposal, SBA limitations on subcontracting, project management, division of work, the percentage of the prime contract work the subcontractor will perform, relative experience and profit sharing. *Id.*

### B.     THE "PRESUMED LOSS RULE" UNDER THE SMALL BUSINESS ACT OF 2010

69.     The Small Business Act of 2010 codified the calculation of damages for misrepresentation under the FCA, which significantly increases the ante for prosecutions both by the government and qui tam relators.

70.     Section 1341 of the Jobs Act, also called the "Presumed Loss Rule," provides a presumption of loss to the government equal to the total amount expended on the contract. 15 U.S.C. § 632(w)(1). The offender may not discount the measure of damages by crediting the value of services or goods provided to the government under the contract. *Id.*

71.     Through this Act, Congress established that the government's damages calculation shall use an intended beneficiary analysis. That is, where the government intended the contract to benefit an eligible small business, and an ineligible business received the benefit of that contract, the entire amount paid to the ineligible contractor becomes the loss to the government.

72.     This codification is significant because contractors are liable for three times the total amount of money received under the contract, plus penalties and fees. 31 U.S.C. § 3729.

73.     The new law also changes the certification process for small businesses.  As part of a bid or proposal, small businesses have historically needed to self-certify that they are an eligible small business.  Under the Small Business Act, businesses must both initially register as a small business and annually update their status in the SAM database.  These self-certifications are based on the honor system enforced by significant legal exposure if not accurate.

74.     The Small Business Act also includes a Deemed Certification provision.  Under this provision, a proposal or bid for a federal contract or subcontract "intended for award to small business concerns" constitutes an "affirmative, willful, and intentional certification[] of small business size and status." 15 U.S.C. § 632(w)(2)(A)-(B).  A contractor also makes such a certification by registering as a small business concern "on any Federal electronic database for the purpose of being considered for award of a Federal … contract [or] subcontract."  *Id.* § 632(w)(2)(C).

### C.     THE FALSE CLAIMS ACT

75.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the FCA, 31 U.S.C. §§ 3729-3733, is the primary tool with which the United States combats fraud against the government and protects the federal Treasury.  The Supreme Court has held that the FCA's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the government." *United States v. Neifert-White*, 390 U.S. 228, 232 (1968).

76.     The FCA provides that a person is liable to the United States for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States government … a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).

77.    The FCA establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government."  *Id.* § 3729(a)(2).  The FCA further establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  *Id.* § 3729(a)(1)(B).

78.    The FCA defines "knowingly" to mean that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," and further provides that no proof of specific intent to defraud is required.  *Id.* § 3729(b).

79.    The FCA defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or, (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the government's behalf or to advance a government program or interest, and if the United States government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  *Id.* § 3729(b)(2)(A).

80.    Any person who violates the FCA is liable to the United States for a civil penalty of not less than ten thousand nine hundred fifty-seven dollars ($10,957) and not more than twenty-one thousand nine hundred sixteen dollars ($21,916), plus three times the amount of damages which the government sustains because of the act of that person.  *Id.* § 3729(a); 15 C.F.R. § 63(a)(3).

D.     THE ANTI-KICKBACK ACT OF 1986

81.     The Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8701–8708, modernized and closed the loopholes of previous statutes applying to government contractors.  The AKA applies to a broad range of persons involved in government subcontracting.

82.     The AKA prohibits attempted as well as completed "kickbacks," *id.* § 8702, which include any money, fees, commission, credit, gift, gratuity, thing of value, or compensation of any kind, *id.* § 8701(2).  The Act also prohibits the inclusion of kickback amounts in contract prices is prohibited conduct in itself.  *Id.* § 8702(3).

83.     The AKA requires only that the purpose of the kickback was for improperly obtaining or rewarding favorable treatment in connection with a contract.  *Id.* § 8701(2).  It is intended to embrace the full range of government contracting.

84.     The AKA prohibits the payment, solicitation and receipt of kickbacks by prime contractors, prime contractor employees, subcontractors, and subcontractor employees. These terms are defined in the Act.  *Id.* § 8701(5)-(9).

85.     The AKA defines "kickbacks" to include payments under any government contract. *Id.* § 8701(2).

86.     The AKA imposes criminal sanctions for knowing and willful violations.

87.     The AKA requires each contracting agency to include in each prime contract exceeding $100,000 for other than commercial products or services, a requirement that the prime contractor shall "have in place and follow reasonable procedures designed to prevent and detect violations of section 8702 of this title in its own operations and direct business relationships," and "cooperate fully with a Federal Government agency investigating a violation of section 8702 of this title."  *Id.* § 8703(a)(1)-(2).

88.   Section 3.502-2(i)(1) interprets the "reasonable procedures" required by the AKA to include, for example: "company ethics rules prohibiting kickbacks by employees, agents, or subcontractors; education programs for new employees and subcontractors, explaining policies about kickbacks, related company procedures and the consequences of detection; procurement procedures to minimize the opportunity for kickbacks; audit procedures designed to detect kickbacks; periodic surveys of subcontractors to elicit information about kickbacks; procedures to report kickbacks to law enforcement officials; annual declarations by employees of gifts or gratuities received from subcontractors; annual employee declarations that they have violated no company ethics rules; [and] personnel practices that document unethical or illegal behavior and make such information available to prospective employers."

89.   Government contractors, either of government-unique or commercial items, are required to submit a written report to the government if they have "reasonable grounds to believe that a violation of [the Act] may have occurred." 41 U.S.C. § 8703(c)(1).

90.   Each time an ineligible small business misrepresents in its self-certifications that it is a "small business" in order to win a set-aside opportunity, the large business has won a bid that should have been awarded to a legitimate small businesses instead.  The large business that has misrepresented its size has gained an unfair advantage over honest businesses that have not made such misrepresentations.

91.   The SBA has identified such firms as "bad actors," who are "taking intentional and often fraudulent advantage" of SBA programs. *Helping Small Businesses Compete: Challenges Within Programs Designed to Assist Small Contractors: Hearing Before the Subcomm. On Contracting & Workforce of the H. Small Bus. Comm.* ("*Helping Small Businesses*"), 112th Cong. 4 (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting

and   Business   Development,   U.S.   Small   Business   Administration),   *available   at*
https://smallbusiness.house.gov/uploadedfiles/jordan_testimony.pdf.

92.   The SBA "has no tolerance for a firm found to be acting fraudulently," adding that,
where appropriate, the agency "will act decisively to oust them from our programs and from doing
business with the government generally."  *Id.*

93.   Further, the SBA is continuing to take action and make referrals to the Department
of Justice "against any firm attempting to 'game the system'" with SBA programs.  *Small Business
Contracts: How Oversight Failures and Regulatory Loopholes Allow Large Businesses to Get and
Keep Small Business Contracts: Hearing Before the Ad Hoc Subcomm. On Contracting Oversight
of the S. Comm. On Homeland Security and Gov'tl Affairs*, 112th Cong. 2 (2011) (statement of
Joseph   G.   Jordan,   Associate   Administrator   for   Government   Contracting   and   Business
Development,   U.S.   Small   Business   Administration),   *available   at*
https://www.gpo.gov/fdsys/pkg/CHRG-112shrg68018/pdf/CHRG-112shrg68018.pdf.

94.   The SBA has stated that it "will come down hard on those who seek to take unfair
advantage of our programs and services to the detriment of the many honest small businesses that
depend upon those programs and services."  *Helping Small Businesses*, *supra*, at 5.

## V.   DEFENDANTS'S FRAUDULENT CONDUCT

### A.   TRIMARK USES SMALL BUSINESSES AS ILLEGAL PASS-THROUGHS

1.   Defendants Gill Group and Gill Marketing were acquired by TriMark USA, LLC
on August 1, 2007.   At the time, TriMark—a full-service equipment and supplies distributor—
had 700 employees and generated revenues in excess of $400,000,000 servicing all segments of
the foodservice industry nationwide.   Since then, TriMark has grown and currently has more than
1,000 employees.

95.     TriMark USA President and CEO Jerry Hyman announced that the acquisition gave TriMark "an entrée into an additional sector of our business, government purchases; and Gill Group expands the contract capabilities of all TriMark locations."  In a press release issued by TriMark it was noted that "[b]oth Gill companies are holders of numerous government contracts that service military branches, civilian agencies and other federal facilities across the globe."

96.     What the press release did not reveal was that, due to the acquisition, Gill Marketing was no longer a small business and, moving forward, was not eligible to receive new government contracts set aside for small businesses.

97.     And the timing was no coincidence. Gill Marketing's leadership conceded internally that the acquisition was intentionally designed to close *three days* after GSA exercised its option on a GSA contract that was originally awarded to Gill Marketing as a small business.

98.     By ensuring the TriMark deal closed shortly after the small business contract renewal, Gill Marketing took advantage of its fleeting, 72 hour-window status as a small business for every order issued over the life of the contract, *i.e.*, at least five additional years.  And Gill Marketing did so without ever notifying the Government of the change in its business size as a result of the TriMark acquisition.

99.     However, when the GSA contract expired in 2011—well after the 2007 acquisition by TriMark—Gill Marketing needed to find another way to generate revenue from small business set-aside contracts.

100.     Undeterred, the Gill companies, now openly operating under the TriMark banner, embarked on the scheme described below to fraudulently obtain these set-aside contracts.

### 1.     TriMark's Fraudulent Scheme – An Overview

101.     And TriMark did so by preying on legitimate small businesses by exploiting the access these businesses have to set aside contracting opportunities.

102.   TriMark employs two primary methods in its fraudulent scheme to induce small businesses to serve as pass throughs: relationships and money.  First, as a large business with vast resources and personnel experienced in government contracting, TriMark has cultivated long-standing relationships with both manufacturers and government agencies.  For a small business looking to gain experience doing business with the federal government, there is significant value in obtaining access to both groups. And TriMark knows this.

103.   As part of its pitch to legitimate small businesses, TriMark acknowledges that it is looking to "capture sales we are precluded from," while simultaneously selling the pass-through arrangement and access to manufacturers and customer agencies as a "growth opportunity" for the small business.  TriMark falsely claims to have "never seized this set aside or preference business" because it has not yet "had that trusted partnership" with a small business when, in fact, TriMark has "seized" on establishing pass-through relationships with multiple companies over the years.

104.   Under the second method, TriMark leverages its considerable financial resources, including paying "fees" to a small business simply for the use of its small business classifications, offering financing to the small business it would not have otherwise qualified for, and controlling the pricing offered to the government to ensure set-aside contracts go through TriMark.

105.   First, TriMark pays a fee on the work that was passed through the small business as part of the set-aside contract.  The small business does not perform any of the actual work on the contract and TriMark does not expect the small business to perform any of the work, except for placing the TriMark-prepared quote on the small business's letterhead and submit the invoice to the government.

106.   Second, TriMark's resources allow it to provide financing, including lines of credit, to the small business to pursue opportunities for which a financial institution would not have

21

deemed the small business eligible. By serving as the small business's de facto financial institution, TriMark tightens its control over the small business, ensuring its participation as a pass through in TriMark's fraudulent scheme.

107. Finally, TriMark's status as a large business allows it to control pricing, which keeps legitimate small businesses from competing on a level playing field. By doing so, TriMark establishes an exclusive market for its services, which is used to attract small businesses who otherwise would not have an entrée to actually win contracts offered by the federal government. TriMark leverages its ability to lower its profit margins to induce small businesses to agree to the pass-through arrangement TriMark offers.

### 2.   TriMark's Fraudulent Scheme – A Plan in Action

108. And when TriMark successfully finds a small business to serve as a pass through, TriMark exercises total control over the entire contracting process. TriMark decides when to bid, what to bid, how to fulfill the contract, including negotiating terms and conditions with manufacturers without the small business, and ultimately, the small business' profit for providing TriMark access to its small business classification. In fact, TriMark uses this level of control as a selling point, insisting that the small business agree to an exclusive arrangement with TriMark, which prohibits the small business from partnering in legitimate business deals with other businesses.

109. Further, TriMark intentionally shields its pass-through arrangements from review by third parties. TriMark actively discourages small businesses from seeking basic legal advice about the agreement, conditioning moving forward only "as long as we can keep attorneys out of this."

110.   With regard to the contracting process, TriMark scours procurement databases, looking for contracting opportunities set aside for small businesses, despite the fact that TriMark itself is not eligible to compete for these opportunities.

111.   Once an opportunity is identified, TriMark e-mails the small business with the solicitation number and the buyer/source information.  TriMark then prepares the quote, deciding all material terms, including pricing, product specification sheets, and warranty information. TriMark also decides what small business "fee" should be added to the quote.

112.   TriMark directs the small business to simply repackage the TriMark-created quote using the small business's own cover letter, company information and signature.  TriMark makes sure to have the small business remove any mention or reference to TriMark in the quote in an effort to conceal its role in the process.  The small business is then directed to submit the quote to the government purchaser, with instructions to blind copy TriMark officials on the email submission.  This way, TriMark is able to maintain control over the procurement process, while again concealing its unlawful involvement from the federal government.

113.   If the small business (using TriMark's quote) is awarded the contract, TriMark again takes control of the process, placing the order directly with the manufacturer.  TriMark handles every aspect of fulfillment, including the length, height, width and weight of the order, the carrier to be used, the installer, whether the order will be placed in a case, carton or pallet, and the ship date.

114.   Once the product is delivered to the government purchaser, TriMark manages the invoicing process.  And when the small business receives payment from the government, TriMark immediately takes its share, leaving the small business with only 1-2% of the entire invoice amount.

115.   The process is repeated over and over again, with TriMark requiring that the small business send all requests for quotations ("RFQs") directly to TriMark.

116.   Once TriMark establishes a foothold with a small business, it had no intention of relinquishing its newfound access to small business contracting opportunities.

### B.   GSI IS AFFILIATED WITH TRIMARK AND THUS IS NOT AN ELIGIBLE SMALL BUSINESS

117.   Since 2000 Defendant GSI has certified in its online representations and certifications in the System for Award Management ("SAM") database that it was a qualified small business, and then represented as part of its bids on government contracts that this certification was current and accurate.

118.   But since at least 2013, this representation in the SAM database was false, and GSI knew that it was false when made.

119.   GSI's SAM submissions have represented GSI as a small business for numerous types of food service product categories, including kitchen equipment and appliances.   For example, beginning at least in August 2015, GSI has represented itself as small for NAICS 333241, "Food Product Machinery Manufacturing," along with numerous other NAICS codes, which have a size standard of 500 employees.

120.   But GSI's representation was, and is, false because GSI, including its affiliate TriMark, has had well over 500 employees since at least 2013.

121.   GSI knowingly misrepresented its eligibility as a small business to fraudulently obtain contracts set aside for small businesses.   As a result of its misconduct, GSI undercut one of the central purposes of the SBA program.   Accordingly, the United States did not receive the intended benefits of a qualified small business receiving and performing federal contracts.

122.   Using its fraudulent small business classification, GSI received tens of millions of dollars' worth of contracts set aside for legitimate small businesses.  GSI is not, and has not been, an eligible small business because it is affiliated with TriMark through, among other things, common management and ownership.

123.   GSI and TriMark are affiliated through common management because TriMark has the ability to exercise critical influence or substantive control at GSI.  13 C.F.R. § 121.103(e) (common management "arises where one or more officers, directors, managing members, or partners who control the board of directors and/or management of one concern also control the board of directors or management of another concern").

124.   The first annual report filed by Government Sales, LLC in 2013 revealed two critical features of the new business entity.

125.   First, Government Sales, Inc.—from its creation in 2000 through its final annual report filed in 2013—listed its "nature of business" as simply "furniture sales."  And the number and value of contracts with federal agencies during its existence reflected a relatively modest business.  Specifically, from 2005 through 2012, Government Sales, Inc. was awarded thirty-five contracts worth approximately $1.7 million, or roughly five contracts per year at approximately $200,000 per award.

126.   In March 2013, Government Sales, Inc. submitted Articles of Organization for the purposes of converting to a limited liability company, *i.e.*, Government Sales, LLC under the conversion laws of the State of North Carolina.

127.   From the date of conversion to the present, Government Sales, LLC has represented that it is in the business of providing "foodservice equip[ment] and furniture sales to [the] fed[eral] government."  And that same month the company was awarded the first of many government

contracts specifically set aside for small businesses. And unlike Government Sales, Inc.'s modest numbers from 2005 through 2012, Governmental Sales, LLC has flourished. Specifically, from March 2014 through March 2019, Government Sales, LLC has generated over $40 million in revenue via more than 2,000 awards issued by the federal government. The company is averaging more than $8.5 million in annual sales and 400 awards per year.

128.   The sudden surge in federal procurement dollars awarded to Defendant Government Sales, LLC was no accident. The spike in revenue was tied directly to Defendant TriMark's emergence as GSI's partner in its federal contracting business.

129.   The second critical feature of Government Sales, LLC's annual report revealed TriMark's active involvement in the new small business. While Robinson lists himself as a member of the LLC, he also identifies Defendant TriMark USA as a member. In fact, the 2016 filing for the LLC is actually signed and certified not by Robinson, but by TriMark controller Phyllis Leon. Government Sales, LLC continued to list TriMark USA as a member every year through 2017, including in filings with the Secretary of State in both California and Louisiana.

130.   TriMark's impermissible involvement in the day-to-day operations of GSI is reflected in the fact that key principals for GSI, including Gil McClurg, formerly held senior management positions at Defendant TriMark Gill Marketing in that company's federal sales division. McClurg worked at Gill Marketing beginning in 1983. More recently he served as the company's Senior Vice President of Marketing. In March 2018, McClurg announced in an internal email that he had retired from TriMark Gill Marketing and would be consulting with Government Sales, LLC. In that same email, McClurg provided his new email address, Gil@governmentsalesllc.com. But while McClurg did begin working for GSI, he never actually left TriMark. In fact, McClurg continued to serve as Vice President of Sales and Marketing into

2019, helping both companies secure government contracts, including those set aside for small businesses.

131.  GSI and TriMark are also affiliated through the totality of the circumstances.  13 C.F.R. § 121.103(a)(5).  Former TriMark sales and marketing personnel, including Charles Robinson, Kimberly Barr and Janet Howard, helped found and manage GSI.  And some of these individuals simultaneously worked for both TriMark and GSI—a fact that was concealed from the public and, more critically, the federal government.

132.  Charles Robinson's overlapping roles at both companies further illustrates the control that TriMark has maintained over GSI.  GSI was incorporated in North Carolina in 2001 by Robinson.  Robinson has remained the President of GSI ever since and he lists himself in SAM.gov as the company's primary point of contact.  However, an internal TriMark/Gill Marketing sales territory map dated October 2012 also identifies Robinson as a TriMark/Gill Marketing employee.  Specifically, the internal document reveals Robinson's role as a "GSA and Government Contracts Contact" for TriMark/Gill Marketing, listing both a Gill Marketing email address (crobinson@gillmarketing.com) and a mobile phone number that Robinson also used at GSI during the same time period.

133.  Kim Barr's dual roles at TriMark and GSI—and the timing of her move to GSI— highlight TriMark's plan to use GSI as a small business pass through.  In March 2013—the same month that Government Sales, Inc. was formally converted to Government Sales, LLC and began listing TriMark USA as a member of the company—Barr left TriMark to join GSI as a "Government Foodservice Equipment Sales" employee.  A GSI newsletter revealed Barr's transfer at the time.

134.   In yet another example, Janet Howard was listed as a TriMark employee at least as late as September 2013, yet was receiving emails at a "govtsalesinc@gmail.com" account in February   2013.   This   is   noteworthy   because   official   emails   from   GSI used "governmentsalesinc.com" domains, revealing that Ms. Howard was conducting business for GSI using an "off book" Gmail account, while at the same time being employed by TriMark. Howard has held herself out as GSI's secondary point of contact in the SAM.gov database beginning as early as September 2013.

135.   Beyond these individuals, TriMark uses its own employees to perform services on behalf of GSI.  These are TriMark employees, paid by TriMark to work in TriMark's offices, while at the same time preparing and helping submit quotes on behalf of GSI for small business set-aside opportunities.  And this was not a one-off arrangement.  In fact, TriMark made similar unlawful offers to other small businesses in an effort to secure the maximum number of set-aside contract opportunities for itself, despite its status as a large business.

136.   Based on all of the above factors, GSI is affiliated with TriMark.  And, when taken together, the combined number of employees count exceeds the threshold for NAICS 333241, "Food Product Machinery Manufacturing," along with numerous other NAICS codes, which have a size standard of 500 employees.  Accordingly, GSI was not an eligible small business and thus was precluded from being awarded small business set-aside contracts.

137.   As a result, Defendant GSI submitted and/or caused to be submitted to the United States false and/or fraudulent claims and false statements regarding its small business eligibility when it bid on the government contracts set aside for eligible small businesses and submitted claims for tens of millions of dollars in payments under those contracts.  These claims and statements falsely and/or fraudulently implied and/or expressly represented that GSI was a

qualified small business and that it was eligible for the government contracts. None of these things was true.

## VI.   DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS

138.   Businesses seeking to do business with the government must complete and sign a FAR Report that contains representations and certifications relating to the businesses' eligibility to participate in certain government programs. This FAR Report, which is ultimately submitted in the SAM database, contains the following averment:

> I have read each of the FAR and DFARS provisions presented below. By submitting this certification, I, [company representative], am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to penalties if I misrepresent [the company] in any of the below representations or certifications to the government.

139.   In addition, contractors (like Defendants) who do business with the government typically submit invoices for payment to the government using paper, email (less common), and electronic portals (most common).

140.   The process begins when a contractor completes an electronic invoice form, which requires certain information including the contract number, the contractor's code and the method for payment. Also included on the invoice are fields indicating whether the contract is unrestricted or a set-aside acquisition.

141.   TriMark's fraudulent pass-through scheme was devised to take advantage of timing; small business set-aside awards are also paid faster by the government. *See* OMB Mem. M-11-32, "Accelerating Payments to Small Businesses for Goods and Services," Sept. 14, 2011, *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2011/m11-32.pdf. According to Kimberley Gill Rimsza, who joined Gill Marketing as an Executive Vice President in 1990 and currently serves as its President, TriMark placed a premium on securing

awards set-aside for small businesses because it helped TriMark get its hands on the government's money more quickly.   This improved TriMark's cash flow, which ultimately fueled further financing of the fraudulent scheme.

142.   Defendant GSI submitted numerous false claims to the government in the form of invoices on its unlawfully obtained contracts, which impliedly certified that GSI was a legitimate small business concern when it was awarded contracts by the government.

143.   The intentional misrepresentations regarding GSI's true size (when including employees from affiliated TriMark) that were contained in their certifications submitted to the government, were false within the meaning of the FCA.

144.   Claims for payments submitted by Defendants to the government, in part or in whole, were based on their knowledge that GSI had misrepresented its size as small, and thus were false within the meaning of the FCA.

145.   GSI's misrepresentations regarding its size as small caused it to be awarded contracts that were void ab initio and ultimately caused the submission of claims for payment that were false when made.

146.   GSI's misrepresentations regarding its size status as small were made knowingly and with the intent to cause the submission of false claims to government Programs.

147.   Government Programs paid Defendants based on Defendants' false claims and certifications, and as a result have incurred and continue to incur significant damages due to Defendants' intentional misrepresentations regarding GSI's size and status as a small business.

148.   By falsely certifying their eligibility to receive monies on small business contracts, and causing subsequent claims for payment to be made that Defendants knew were ineligible for

payment by government Programs, Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as alleged herein.

149.   Defendants' unlawful conduct resulted in tens of millions of dollars in improper payments by government Programs.

## VII.   DEFENDANTS IMPROPERLY SOLICITED/PAID /RECEIVED KICKBACKS IN VIOLATION OF THE AKA

150.   Defendants regularly solicited, paid, and/or received kickbacks in the form of small business "fees" for use of small business classifications in violation of the AKA and the FCA.

151.   An AKA violation is a proper predicate for FCA liability on the grounds that:  1) Defendants expressly undertook to comply with the AKA as a condition of payment under the Prime Contracts and their flow down provisions, and thereafter certified (expressly and/or impliedly) that they had complied with the AKA as a condition of payment, thereby supporting liability for making false certifications (express and/or implied); and/or 2) violations of the AKA "taint" the claims submitted to the government and render the claims "factually false" and ineligible for payment because they violate a condition of payment.

152.   On numerous occasions, Defendants had reasonable grounds to believe that violations of the AKA were occurring, and yet failed to promptly report the possible violations in writing to the government.  These failures constituted further violations of the AKA.

153.   Defendants violated the FCA by expressly or impliedly making false statements, records, or certifications in response to the government requests for proposal that they were in compliance and would continue to comply with the AKA.

154.   Defendants committed additional violations of the FCA by presenting or causing to be presented to the government their claims to obtain payment in which they expressly or impliedly made false statements, records or certifications that they had complied with the AKA.

155.   The United States government, either directly or indirectly through its agencies or intermediaries, would not have contracted with Defendants due to conflict or other reasons and/or would have sought significant cost and/or price concessions had it known that the contracts/subcontracts, products, and/or services for which the contracts were proposed were subject to a scheme to violate the AKA provisions and pertinent FARs.

156.   The United States government, either directly or indirectly through its agencies or intermediaries, would not have honored Defendants' claims for payment, had it known that the contracts/subcontracts, products, and/or services for which the claims were made, were provided in a manner that violates the AKA provisions and pertinent FARs.

## VIII.   DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES

157.   One facet of Defendants' scheme involved one or more schemes with other entities to further the overall fraudulent representations of Defendants' size through a pattern and practice of false and misleading representations ("overt acts").

158.   The overt acts included the submission to government Programs by these affiliated entities of knowingly false certifications of compliance with laws that are conditions of government Program payments.  As a result of these false certifications, government Programs made payments to all Defendants under small business contracts that Defendants were ineligible to receive. The Co-Conspirators include numerous other related entities through which Defendants have conducted their fraudulent scheme.

159.  Defendants and their co-conspirators shared in the conspiratorial objective to deceive the United States concerning their affiliated relationships with one another, and with other parties and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of Defendants' scheme to target and financially injure government

Programs.  Accordingly, Defendants and the co-conspirators entered into these unlawful financial relationships for the purpose of Defendants' planned scheme to target government Programs and submit or cause the submission of false or fraudulent claims and records.

160.   Defendants intentionally conspired amongst themselves and with one or more of these affiliated entities to get false or fraudulent claims reimbursed by the United States.  One or more of these conspirators performed one or more overt acts to effect the object of the conspiracy, and government Programs suffered damages as a result of these false or fraudulent claims.

161.   Through the acts and omissions alleged herein, and from at least 2011 to the present, Defendants, with each other and with affiliated entities known and unknown, knowingly agreed and conspired to defraud the government by having false or fraudulent statements, records, certifications, and invoices submitted to, paid and approved by government officials, their contractors, intermediaries and/or their agents.

162.   By virtue of their conspiratorial agreement, Defendants caused to be presented, made and/or used false or fraudulent invoices, and/or false records or statements, including size and status certifications to government, causing the United States to suffer significant damages.

163.   The United States is therefore entitled to recover from Defendants treble damages under the Federal FCA, in an amount to be proved at trial, plus a civil penalty for each violation, as well as double damages under the AKA, in an amount to be proved at trial, plus a civil penalty of at least $10,000 for each violation.

## COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

164.   Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

165.   This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729–3733.

166.   Through the acts described above, Defendants and their agents and their employees knowingly misrepresented submitted or caused to be submitted to the United States government knowingly false or fraudulent claims for set-aside small business contracts.

167.   As alleged herein, Defendants' representations to the United States were knowingly false.  By engaging in the conduct alleged herein, Defendants knowingly submitted, or caused to be submitted, false claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

168.   Through the acts described above, Defendants and their agents and employees knowingly made, used or caused to be made or used false statements and records to get such false and fraudulent claims paid and approved by the United States government.

169.   The United States, unaware of the falsity of the records, statements and claims made by Defendants, paid Defendants for claims that would otherwise not have been allowed.

170.   By reason of Defendants' false records, statements and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

171.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

172.   As alleged herein, Defendants knowingly made false representations to the United States.  Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).

173.   Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

174.   By reason of Defendants' false records, statements, and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

### COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))

175.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

176.   As detailed above, Defendants knowingly conspired, and may still be conspiring, with the various entities and/or persons alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B). Defendants and these entities and/or persons committed overt acts in furtherance of the conspiracy as described above.

177.   As a result of Defendants' actions as set forth above, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

### COUNT IV
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

178.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

179.   As alleged in detail above, Defendants knowingly avoided or decreased their obligation to pay or transmit money to the government.  Specifically, Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to

the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

180.  As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

181.  By reason of Defendants' false records, statements, and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729–3733;

B.     That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Relator, to be identified at trial after full discovery, resulting from Defendants' unlawful retaliation against Relator;

D.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

E.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

F.      That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

G.      That Relator be granted such other and further relief as the Court deems just and proper.

## X.      JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Dated: July 26, 2019

**HODGSON RUSS LLP**
*Attorneys for Plaintiff/Relator*

By:     _Michelle L. Merola_
        Daniel Oliverio, Bar Roll No. 517878
        Michelle L. Merola, Bar Roll No. 514446
        The Guaranty Building
        140 Pearl Street, Suite 100
        Buffalo, New York 14202-4040
        Tel. No.: 716.856.4000

**BARON & BUDD, P.C.**
*Attorneys for Plaintiff/Relator*
Andrew M. Miller (*pro hac vice* to be filed)
W. Scott Simmer (*pro hac vice* to be filed)
600 New Hampshire Avenue, NW, Suite 10-A
Washington, DC 20037
Tel. No.: 202.333.4562