## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among (i) the United States of America, acting through the United States Attorney's Office for the Northern District of New York and the United States Attorney's Office for the Eastern District of Washington (collectively, the "United States"); (ii) TriMark USA, LLC ("TriMark USA"), Gill Group, Inc. ("Gill Group"), and TriMark Gill Marketing ("Gill Marketing") (collectively, "Defendants"); (iii) Kimberley A. Rimsza ("Ms. Rimsza"); and (iv) Fox Unlimited Enterprises, LLP ("Relator"), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

## RECITALS

A. TriMark USA provides foodservice equipment and supplies, restaurant equipment, restaurant supplies, and build and design services. Gill Group is a wholly owned subsidiary of TriMark, and specializes in the supply and installation of foodservice equipment with a focus on large foodservice consultant designed projects to chain restaurants, hotels, and corporate cafeterias. Gill Marketing is an unincorporated division of Gill Group, and specializes in providing foodservice equipment for military branches, VA Medical Centers, the Federal Bureau of Prisons, civilian agencies, and other federal facilities across the globe. Ms. Rimsza was the President of Gill Marketing (and is referred to herein as the "former Gill Marketing President") and served as a TriMark USA executive from 2016 until her retirement in February 2021.

B. Between 2011 and 2021, Gill Marketing worked with three small businesses to access small business, veteran-owned small business ("VOSB"), and service-disabled veteran-owned small business ("SDVOSB") set-aside contracts to which Gill Marketing was not eligible

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

to bid on its own.  The three small businesses with whom Gill Marketing worked are referred to herein as Companies 1-3.

C.    The president of Company 1 testified under oath that: (1) Company 1 is a supplier, distributor, and regular dealer of commercial foodservice equipment, medical equipment, and other products and services to federal government agencies, and (2) between approximately May 2011 and approximately April 2013, Gill Marketing was Company 1's primary supplier of kitchen and foodservice products on federal government contracts.

D.    In March 2011, a Gill Marketing employee contacted Company 1 about the possibility of the two companies working together to obtain small business set-aside contracts. The companies discussed that Company 1 had several small business certifications, including an SDVOSB classification, and it could be mutually beneficial for the two companies to work together.

E.    Also in March 2011, a Gill Marketing employee wrote to the former Gill Marketing President that she met Company 1's owners, and thought that Gill Marketing should "try to find something in the next few days that we can flip [their] way.  I am going to find the rfq.  Set up a dummy [AutoQuotes] page for them . . . enter our normal bid board markups etc. then get with [Company 1] to see what kind of markup [they] want to add . . . send [them] a quote all ready to send to buyer . . . . I would prefer to keep as much control over this as possible initially."

F.    On multiple occasions, primarily during the time that the parties had in place a General Services Administration ("GSA") Mentor-Protégé Agreement, Gill Marketing identified opportunities for Company 1 to bid on government contracts.  Many of these were SDVOSB or

2

other small business set-aside contracts which Gill Marketing was not eligible to bid on its own, but on which Company 1 could bid due to its small business status.

      G.      For foodservice equipment contracts performed by Company 1, most of the contractual value was paid by Company 1 to Gill Marketing for the equipment, the delivery, the installation, and other services provided by Gill Marketing. Generally, the only component of the contract value that was not paid directly by Company 1 to Gill Marketing was Company 1's markup on the contract, which was typically between 1% and 5% of the total contract value. On some occasions, Gill Marketing told Company 1 the specific markup to add to its price from Gill Marketing, and therefore, what total price to propose to the government for a particular contract.

      H.      Gill Marketing also "ghostwrote" emails for Company 1 to send its federal government customers and requested that Company 1 cut and paste Gill Marketing's proposed language and send it to government officials as though it were coming from Company 1.

      I.      In 2017, Company 1 reached out to the former Gill Marketing President to rekindle the business relationship. As part of the ensuing discussions, in December 2017, the former Gill Marketing President wrote Company 1 that Gill Marketing wanted Company 1 to serve "as our TriMark partner focusing on capturing set aside business that we can't participate in" and proposed that they "[w]ork together on set aside GC Contracts for 8A business – where we could either be a sub to [Company 1] or we could work together in concert to obtain larger contracts."

      J.      Company 4 is a general contractor with several thousand employees. In 2011, Company 4 was awarded a multimillion-dollar contract by the GSA, which had a project scope that included supplying and installing kitchen equipment. Company 4 decided to subcontract this work to another company. Under typical government contract rules, Company 4 could use

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

subcontracts awarded to eligible small businesses to meet Company 4's small business subcontracting goals.

K.       In 2011, Gill Group recommended that Company 4 award an approximately $1 million first-tier subcontract to Company 1 for kitchen equipment and installation work, even though, according to Company 1, it had never before served as a subcontractor on a federal construction project and Company 4 had never previously worked with Company 1.  Company 4 required that Gill Group enter into a second-tier subcontract agreement with Company 1.  Under this arrangement, Gill Group was responsible for much of the work and received approximately 99% of the amounts paid by Company 4 for the work.  Gill Group provided some of the necessary insurance to Company 1 as well as assistance with obtaining bonding.  Gill Group provided Company 1 with pricing and delivery terms for each project change order based on the agreements, and also coordinated directly with Company 4.  Company 4 should not have claimed credit for subcontracting the project to a small business because of the large proportion of work Gill Group performed under the second-tier subcontract and because Company 1 has represented that it provided no value to the transaction aside from its set-aside status.

L.       Company 1 eventually became concerned about the legality of its relationship with Gill Marketing and, in December 2011, compiled and sent two Gill Marketing employees an email that attached a document entitled "concern2," which flagged several issues, including affiliation, the nonmanufacturer rule, the ostensible subcontractor rule, and potential monetary liability based on Company 1's belief that it was merely serving as a broker for Gill Marketing without adding value to the government.  Company 1 attached various documents to its email, specifically highlighting one that included language stating that "the Small business Jobs Act of 2010 significantly raises the stakes for contractor misrepresentation of small business status.

4

Now, a federal contractor that receives an award after incorrectly representing itself as a small business may face False Claims Act ("FCA") exposure for three times its total contract proceeds, plus other damages, even if the contractor fully performed the contract to the satisfaction of the government."  One of the Gill Marketing recipients of the email replied that following their earlier conversation about the "concern2" document, she had spoken with the former Gill Marketing President who stated that Company 1 takes title when billed by Gill Marketing.  The Gill Marketing employee also stated that the sender should "calm down and enjoy your weekend."

M.      Company 2 was incorporated in 2000 and, at the time, primarily sold furniture to the federal government using GSA contracts.  In June 2008, Company 2's founder joined Gill Marketing.

N.      While employed by Gill Marketing, at least four Gill Marketing employees had access to and used Company 2's email accounts to conduct government set-aside business for Company 2.

O.      In 2011, a Gill Marketing employee, with the former Gill Marketing President's knowledge, helped Company 2's owner add manufacturers to Company 2's GSA schedule contract.  These manufacturers were generally large businesses with whom Gill Marketing had a business relationship and with which Gill Marketing would coordinate to supply products on set-aside contracts to be bid on and won by Company 2, using Gill Marketing's pricing and business relationship with the large business manufacturers.

P.      In July 2012, a Gill Marketing employee inaccurately represented herself in an email to an Army official as a Company 2 employee and requested that the Army repost a contracting opportunity so that Company 2 could submit a revised bid.

Q.      In December 2012, Company 2's founder separated from Gill Marketing and in January 2013, TriMark purchased a 49% interest in Company 2.

R.      Beginning around this time, until approximately March 2015, Company 2 began to rent office space for some employees in the same building used by Gill Marketing, and the two companies' employees occasionally shared office supplies with each other. At times during this period, Gill Marketing employees, as part of their Gill Marketing duties, would work on Company 2 government contracting opportunities.

S.      At times, Gill Marketing's Manager of Contract Bids used Company 2's login credentials to log onto government websites to conduct business and identify opportunities on behalf of Company 2.

T.      In November 2012, a TriMark executive emailed the former Gill Marketing President about enabling Company 2 to participate in one of TriMark's buying groups following TriMark's acquisition of a 49% stake in Company 2. He explained that the buying group term that would be used to describe Company 2's relationship with TriMark "is 'affiliated entity' which worries me."

U.      In connection with TriMark's acquisition of its interest in Company 2, TriMark arranged for Company 2 to participate in the buying group as a TriMark "affiliate." The buying group's LLC agreement defined "affiliate" as an entity "controlling, controlled by or under common control with" a member of the group.

V.      In June 2013, a Gill Marketing employee copied the former Gill Marketing President on an email to a TriMark supplier informing the supplier that Company 2 is "TriMark's affiliate with small business status" and asking the supplier to "get [its] product line

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

on [Company 2's GSA] contract so they can offer [the supplier's products] on small business set-aside bids."

W.    In July 2014, the former Gill Marketing President wrote one of Gill Marketing's suppliers, "I assume it is okay for [Company 2] to use [Gill Marketing's] discount as well since they are an extension of us and will be bidding the small business set aside acquisition that Gill is precluded from bidding due to our large business classification."  In November 2014, the former Gill Marketing President described Company 2 as Gill Marketing's "small business partner so when a government acquisition is set aside for Small Business that is when [Company 2] picks up the ball and runs with it."

X.    In March 2018, Gill Marketing provided a vendor a document which included Company 2 in its list of "TriMark Company Locations."

Y.    In March 2018, a Gill Marketing employee circulated an email to the former Gill Marketing President and others explaining that TriMark owned the domain for Company 2's website and stating: "We Finally have the approval to move forward with the [Company 2] website going live! ☺ We need to Make sure that TriMark is not listed ANYWHERE on the site."

Z.    Gill Marketing's annual budget commentary, which was circulated to the former Gill Marketing President and certain TriMark executives, described Gill Marketing's relationships with small businesses.  For example, in November 2013, it stated: "Gill works closely with [Company 2] on procurements which have been set aside for small business[,]" that is, "acquisitions for small businesses which Gill is precluded from participating in."  In December 2016, it stated: "We will continue to be just as aggressive in 2016, so we can experience sales growth and still be seen as the dominant player in this niche market of Federal

7

Government acquisition" and "We will also work more closely with Small business, [Company 2], and other set aside companies."  The same document noted that Gill Marketing had lost a significant portion of its Department of Veterans Affairs ("VA") sales to small businesses and to SDVOSBs, and that it had come up with an "SDVOSB Solution" in which it would "partner[] with two established SDVOSBs . . . to foster that relationship so we can be in a position to recapture lost VA business we experienced this past year."  The December 2017 budget commentary noted that Gill Marketing had "partnered with two SDVOSB Company's [Company 3] and [Company 1], which also holds an 8A certification.  We are working to establish even closer relationships with these companies to drive business that we can capture through these companies and their designations."

AA.     In January 2018, Company 5, a small business, submitted a size protest to the Small Business Administration ("SBA") in connection with a set-aside contract that was awarded to Company 2, arguing that Company 2 "is simply a pass-through entity to enable this large business (TriMark USA) to unjustly be awarded contracts which are set aside for small businesses."  The protest was dismissed as to the protestor but, shortly thereafter, the SBA adopted the protest and initiated a size determination for Company 2.

BB.     In connection with the size determination, the former Gill Marketing President and others had the opportunity to review Company 2's submissions and statements made therein before Company 2 filed them with SBA.  Similarly, the former Gill Marketing President and others took part in multiple email and phone conversations with Company 2 and the law firm that was representing Company 2, in which the subject of the size determination and the submittals to SBA were discussed.  Company 2, through counsel, represented that "[Company 2] independently generates and conducts its business"; that "there is no agreement that [Gill

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

Marketing and Company 2] will work together"; that "[Company 2] independently prepares its proposals for and performs orders issued under" its GSA contracts; and that "[Company 2] is not reliant in any manner on Gill Marketing to win (or perform)."

CC.     As reflected above, these statements were not accurate and complete.  Gill Marketing assisted Company 2 in various ways, including by identifying set-aside business opportunities for Company 2, discussing bidding strategies, and enabling Company 2 to participate in the buying group.

DD.     Company 3 is a vendor and distributor of healthcare and other products to federal government agencies and some commercial customers.  Company 3's president testified under oath that (1) Company 3 is, and always has been, an SDVOSB, and (2) between approximately 2017 and March 2021, Gill Marketing was Company 3's primary supplier of kitchen and foodservice products on federal government contracts.

EE.     When Gill Marketing and Company 3 began working together, Gill Marketing provided assistance to Company 3 in obtaining a GSA schedule contract for foodservice supplies, which Company 3's president testified Company 3 did not hold prior to its relationship with Gill Marketing.  Gill Marketing reached out to and interacted with GSA on Company 3's behalf to facilitate this new contract.  Because Company 3 was not experienced in supplying foodservice supplies and did not have relationships with foodservice supply manufacturers, Gill Marketing also drafted certain of Company 3's submissions, product list and costs, and other reports necessary for Company 3 to obtain the contract.

FF.     For foodservice equipment purchases, Company 3's role in the procurement was generally being the face of the contract to the government, project coordination, billing the government for the work, and on many occasions, using its SDVOSB status to qualify for work

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

that Gill Marketing could not bid on itself.  Generally, Gill Marketing, not Company 3: (1) negotiated with the manufacturer regarding pricing for equipment, (2) arranged for delivery of the equipment directly to the government customer, and (3) arranged for installation of the equipment once it reached its destination.

GG.    Gill Marketing also identified opportunities for Company 3 to bid on government set-aside contracts.  These were generally SDVOSB or small-business set-aside contracts upon which Gill Marketing was not eligible to bid on its own, but which Company 3 could bid on due to its SDVOSB status.  Gill Marketing also at times took the initiative to prepare a quote on Company 3's behalf in response to a solicitation.  In addition to identifying opportunities on which Company 3 could bid, Gill Marketing at times directed Company 3 to bid or not to bid on certain opportunities.

HH.    For foodservice equipment contracts performed by Company 3, most of the contractual value was paid by Company 3 to Gill Marketing for the equipment, the delivery, the installation, and other services provided by Gill Marketing.  Generally, the only component of the contract value that was not paid directly by Company 3 to Gill Marketing was Company 3's markup on the contract, which typically ranged from 1% to 5% of the total contract value.  On some occasions, Gill Marketing suggested what markup Company 3 should add to its price from Gill Marketing, and therefore, what total price to propose to the government for a particular contract.

II.    Gill Marketing also "ghostwrote" emails for Company 3 to send its federal government customers and requested that Company 3 cut and paste Gill Marketing's proposed language and send it as though it were coming from Company 3.

10

JJ.     In a February 2018 email discussing Gill Marketing's relationship with Companies 2 and 3, a Gill Marketing employee wrote to the former Gill Marketing President: "While looking at the pricing we might want to keep in mind that [Company 3] may become our horse in the race[.]  Gill needs to gain as much of the small business pie as it possibly can . . . to maintain our own viability."

KK.     On July 26, 2019, Relator filed a *qui tam* action in the United States District Court for the Northern District of New York captioned *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").  Relator alleges, among other things, that Gill Marketing and Gill Group presented, caused to be presented, and conspired to present, false claims and statements to the United States in connection with contracts that were set aside for performance by small businesses.  The United States intervened in the Civil Action against Gill Marketing and Gill Group on December 17, 2021.  The United States contends that it has certain civil claims against Gill Marketing, Gill Group, and Ms. Rimsza under the False Claims Act, codified at 31 U.S.C. §§ 3729-3733, and the common law, as specified below, for engaging in the conduct set forth in this Paragraph, as well as Paragraphs A-JJ above (the "Covered Conduct"):

> The United States alleges that Gill Marketing, and on one occasion Gill Group, took advantage of federal programs that set aside procurements, and encouraged subcontracting opportunities, for small businesses, veteran-owned small businesses, and service-disabled veteran-owned small businesses.  Gill Marketing primarily engaged in this conduct by its relationships with and influence over three companies in certain time periods – Company 1 (2011-2013), Company 2 (2013-2021) and Company 3 (2017-2021) – when those three companies were awarded federal set-aside contracts with the North American Industry Classification System (NAICS) codes and Product Services Codes (PSC) set forth in Exhibit A.

The United States alleges that the conduct set forth in Paragraphs A-JJ above was part of a scheme devised and engaged in by certain Gill Marketing and Gill Group employees, including the former Gill Marketing President, to circumvent small business, veteran-owned small business, and service-disabled veteran-owned small business contracting requirements to secure set-aside contracts for Companies 1-3 that those companies would pass along to Gill Marketing for fulfilment.  The United States further alleges that, in addition to set-aside contracts directly between Companies 1-3 and the government, and as further discussed in Paragraph K, the scheme and conduct described above also resulted in Company 1 improperly receiving a small business set-aside subcontract from Company 4.

The United States contends that Gill Marketing, through Ms. Rimsza and others, exerted significant influence over each of the small businesses' decision-making processes during the bid, award, and performance of these contracts.  Gill Marketing exercised influence over these entities in various ways, including by dictating pricing and contract terms, directing them to send ghostwritten emails to government officials, and dictating which contracts they should and should not bid on.  In connection with the award of contracts to these businesses, Gill Marketing caused to be submitted false certifications and statements to the United States representing that the entities met all requirements to be a service-disabled veteran-owned small business, a veteran-owned small business, or small business when Gill Marketing knew, or should have known, that they did not meet such requirements because they were, at all times relevant to this Agreement, affiliated with Gill Marketing.

Gill Marketing, including its former President, knew or should have known that Company 2 intended to make material misrepresentations in its submissions to the SBA in connection with the 2018 size determination.

With respect to the transaction that Gill Group facilitated with Companies 1 and 4, the United States alleges that Gill Group and Company 4 never intended for Company 1 to substantively perform work for the government, and in fact Company 1 added no value to the transaction aside from its set-aside status.  Accordingly, Gill Group caused Company 4 to submit statements that falsely reflected that a small business performed under the contract.

The United States alleges that the foregoing conduct resulted in the diversion of contracts and benefits therefrom intended for small

businesses toward ineligible companies, thereby undercutting the purpose of statutorily created programs designed to encourage contract awards to legitimate small businesses. The United States did not receive the intended benefit of a legitimate small businesses unaffiliated with a larger business receiving and performing federal set-aside contracts.

LL.    Gill Marketing, Gill Group, and Ms. Rimsza (for each of their respective conduct only) admit, acknowledge, and accept responsibility for that which is set forth in Paragraphs A-JJ above, as well as the following: (1) Gill Marketing's conduct in connection with the federal set-aside contracts awarded to Companies 1-3 resulted in violations of federal regulations designed to encourage contract awards to legitimate small businesses, service-disabled veteran-owned small businesses, and veteran-owned small businesses unaffiliated with a larger entity; (2) Gill Marketing executives, including the former Gill Marketing President, knew or should have known that Company 2 intended to submit material misrepresentations to SBA in response to the size determination but took no steps to stop it from doing so or to alert authorities; (3) when Gill Marketing performed a contract with Companies 1-3, the small business's role was generally limited to being the face of the contract, to billing the government for the work, and using its small business status to qualify for work that Gill Marketing could not bid on itself; and (4) with respect to the transaction with Company 1 and Company 4, Gill Group performed all or nearly all substantive work on Company 4's subcontract with Company 1, and understood that Company 1 would be adding little if any value to the transaction aside from its set-aside status.

MM.    This Settlement Agreement is not an admission of liability by Defendants or Ms. Rimsza nor a concession by the United States that its claims are not well founded.

NN.    Pursuant to Justice Manual § 4-4.112, Defendants timely and meaningfully cooperated with the United States during the investigation of this matter. Defendants represent

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

that they have taken comprehensive measures and implemented enhanced controls that they represent will fully remediate and going forward eliminate the conduct at issue in this action. These measures included personnel changes and the implementation of new and revised control procedures and training programs.  Ms. Rimsza represents that she has voluntarily, and without prompting from any government official, enrolled in and will complete continuing education programs addressing ethics and compliance in small business government contracting.

OO.     Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees, and costs solely from Defendants.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.     Defendants agree to pay the United States the sum of $48,500,000 ("Settlement Amount"), of which $21,555,555 is restitution, plus interest at a rate of 3% per annum from November 1, 2021 until and including the day that final payment is made under this Agreement, per the terms set forth in Paragraphs 1(a)-(e).

  a.     By April 30, 2022, or 30 days after Effective Date, whichever is later, Defendants will make payment to the United States in the amount of $24,250,000, plus interest at the rate identified in Paragraph 1.

  b.     Defendants will pay the remaining $24,250,000, plus interest at the rate identified in Paragraph 1, pursuant to the following schedule (the Payments Over Time), in four equal installments by no later than the

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

following dates: (i) October 31, 2022 or 6 months after the Effective Date, whichever is later, (ii) December 31, 2022, or 8 months after the Effective Date, whichever is later, (iii) February 28, 2023, or 10 months after the Effective Date, whichever is later, and (iv) April 30, 2023, or 12 months after the Effective Date, whichever is later.  The Payments Over Time shall be secured pursuant to a Consent Judgment, in the form of Exhibit B.

c.      If TriMark or any of its affiliates is sold, merged, or transferred, or a significant portion of the assets of TriMark or of any of its affiliates is sold, merged, or transferred into another non-affiliated entity, TriMark shall promptly notify the United States, and all remaining payments owed pursuant to the Settlement Agreement shall be accelerated and become immediately due and payable.

d.      The Settlement Amount may be prepaid, in whole or in part, without penalty or premium.

2.      Ms. Rimsza agrees to pay to the United States the sum of $100,000 ("Rimsza Settlement Amount") as a civil penalty, by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the Northern District of New York, within 30 days of the Effective Date of this Agreement.  Ms. Rimsza represents and agrees that she has not and will not seek indemnification for the Rimsza Settlement Amount from any third party, including Defendants, or through any agreement or insurance policy under which she may be entitled to pursue a claim.

3.      Conditioned upon the United States receiving the Settlement Amount and Rimsza Settlement Amount payments, the United States agrees that it shall pay to Relator by electronic

funds transfer 22.5% percent of each such payment received under the Settlement Agreement ("Relator's Share") as soon as feasible after receipt of the payment.

4.     Subject to the exceptions in Paragraph 7 (concerning reserved claims) below and subject to Paragraph 14 (concerning default) and Paragraph 15 (concerning bankruptcy) below, and upon the United States' receipt of the Settlement Amount, plus interest due under Paragraph 1, the United States releases Defendants, together with their predecessors and current and former parent companies, partnerships and corporations; direct and indirect subsidiaries; brother or sister companies; divisions; corporate affiliates; current or former corporate owners; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, or the common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

5.     Subject to the exceptions in Paragraph 7 (concerning reserved claims) below, upon the United States' receipt of the Rimsza Settlement Amount, the United States releases Ms. Rimsza from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, or the common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

6.     Subject to the exceptions in Paragraph 14 (concerning default) and Paragraph 15 (concerning bankruptcy) below, and upon the United States' receipt of the Settlement Amount, plus interest due under Paragraph 1, Relator, for itself and for its members, and for its and its

16

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

members' partners, heirs, successors, attorneys, agents, and assigns, releases Defendants,

together with their predecessors, successors, assigns, subsidiaries, businesses, affiliates,

divisions, sister companies, owners, directors, officers, agents, employees, and counsel, from any

action, in law or in equity, suits, debts, liens, contracts, agreements, covenants, promises,

liability, obligations, claims, demands, rights of subrogation, contribution and indemnity,

damages, loss, cost or expenses, direct or indirect, of any kind or nature whatsoever (including

without limitation any civil monetary claim Relator has on behalf of the United States for the

Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733), known or unknown,

fixed or contingent, foreign, state or federal, under common law, statute or regulation, liquidated

or unliquidated, claimed or concealed, and without regard to the date of occurrence, which

Relator or its members ever had, now has, may assert, or may in the future claim to have, against

Defendants by reason of any act, cause, matter, or thing whatsoever from the beginning of time

to the date hereof.  Relator and its members represent and warrant that it and its members and

counsel are the exclusive owner of the rights, claims, and causes of action herein released and

none of them have previously assigned, reassigned, or transferred or purported to assign, reassign

or transfer, through bankruptcy or by any other means, any or any portion of any claim, demand,

action, cause of action, or other right released or discharged under this Agreement except

between themselves and their counsel.  Notwithstanding the foregoing, or any other terms of this

Agreement, this Agreement does not resolve or release Relator's right pursuant to 31 U.S.C. §

3730(d) to reasonable expenses necessarily incurred, plus reasonable attorneys' fees and costs

relating to the Covered Conduct, the amount of which will be addressed separately by Relator,

Relator's counsel, and Defendants.

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

7.      Notwithstanding the releases given in Paragraphs 4 and 5 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.      Any criminal liability;

c.      Except as explicitly stated in this Agreement, any administrative liability or enforcement right, or any administrative remedy, including the suspension and debarment rights of any federal agency;

d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.      Any liability based upon obligations created by this Agreement;

f.      Any liability of individuals other than Ms. Rimsza;

g.      Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

h.      Any liability for failure to deliver goods or services due; and

i.      Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

8.      Relator and its partners, heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B).  Conditioned upon Relator's receipt of the Relator's Share, Relator and its partners, heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

9.      Defendants and the former Gill Marketing President waive and shall not assert any defenses they may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

10.     Defendants and the former Gill Marketing President fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that they have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

11.     Defendants fully and finally release the Relator and its partners from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Defendants have asserted, could have asserted, or may assert in the future against the Relator or its partners, related to the Covered Conduct and the Relator's investigation and prosecution thereof.  Notwithstanding the foregoing, or any other terms of this Agreement, this Agreement does not resolve or release Defendants' right pursuant to 31 U.S.C. § 3730(d) to assert defenses to Relator's claimed attorneys' fees, expenses, and costs relating to the Covered Conduct, the amount of which will be addressed separately by Relator, Relator's counsel, and Defendants.

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

12.    a.    Unallowable Costs Defined:  All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Defendants, and its present or former officers, directors, employees, shareholders, and agents in connection with:

i.    the matters covered by this Agreement;

ii.    the United States' audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement;

iii.    Defendants' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

iv.    the negotiation and performance of this Agreement; and

v.    the payment Defendants make to the United States pursuant to this Agreement and any payments that Defendants may make to Relator, including costs and attorneys' fees,

are unallowable costs for government contracting purposes (hereinafter referred to as Unallowable Costs).

b.    Future Treatment of Unallowable Costs:  Unallowable Costs will be separately determined and accounted for by Defendants, and Defendants shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c.    Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Agreement, Defendants shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by Defendants or any of their subsidiaries or affiliates from the

20

United States.  Defendants agree that the United States, at a minimum, shall be entitled to recoup from Defendants any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment.  The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine Defendants' books and records and to disagree with any calculations submitted by Defendants or any of their subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by Defendants, or the effect of any such Unallowable Costs on the amount of such payments.

13.    Defendants agree to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement.  Upon reasonable notice, Defendants shall encourage, and agree not to impair, the cooperation of their directors, officers, and employees, and shall use their best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals.  Defendants further agree to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in their possession, custody, or control concerning any investigation of the Covered Conduct that they have undertaken, or that has been performed by another on their behalf.

14.    Default:  a.  In the event that Defendants fail to pay the Settlement Amount as provided in the payment schedule set forth in Paragraph 1 above, Defendants shall be in Default of Defendants' payment obligations ("Default").  The United States will provide a written Notice of Default, and Defendants shall have an opportunity to cure such Default within seven (7) calendar days from the date of receipt of the Notice of Default by making the payment due under

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

the payment schedule and paying any additional interest accruing under the Settlement Agreement up to the date of payment.  Notice of Default will be delivered to Anne Robinson, Esq., or to such other representative as Defendants shall designate in advance in writing.  If Defendants fail to cure the Default within seven (7) calendar days of receiving the Notice of Default and in the absence of an agreement with the United States to a modified payment schedule ("Uncured Default"), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable, and interest on the remaining unpaid balance shall thereafter accrue at the rate of 12% per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance).

b.       In the event of Uncured Default, Defendants agree to entry of the Consent Judgment in the amount of the unpaid principal and interest balance and that the United States, in its sole discretion, may (i) retain any payments previously made, rescind this Agreement and pursue the Civil Action or bring any civil and/or administrative claim, action, or proceeding against Defendants for the claims that would otherwise be covered by the releases provided in Paragraph 3 above, with any recovery reduced by the amount of any payments previously made by Defendants to the United States under this Agreement; (ii) take any action to execute and collect on the Consent Judgment; (iii) file an action for specific performance of the Agreement; (iv) offset the remaining unpaid balance from any amounts due and owing to Defendants and/or affiliated companies by any department, agency, or agent of the United States at the time of Default or subsequently; and/or (v) exercise any other right granted by law, or under the terms of this Agreement, or recognizable at common law or in equity.  The United States shall be entitled to any other rights granted by law or in equity by reason of Default, including referral of this matter for private collection.  In the event the United States pursues a collection action,

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

Defendants agree immediately to pay the United States the greater of (i) a ten-percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action.  In the event that the United States opts to rescind this Agreement pursuant to this paragraph, Defendants waive and agree not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that are (i) filed by the United States against Defendants within 120 days of written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on May 2, 2019.  Defendants agree not to contest any offset, recoupment, and/or collection action undertaken by the United States pursuant to this paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

15.    In exchange for valuable consideration provided in this Agreement, Defendants acknowledge the following:

a.    Defendants have reviewed their financial situation and warrant that they are solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I) and shall remain solvent following payment to the United States of the Settlement Amount.

b.    In evaluating whether to execute this Agreement, the Parties intend that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Defendants, within the meaning of 11 U.S.C. § 547(c)(1), and the Parties conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange.

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

c.    The mutual promises, covenants, and obligations set forth herein are intended by the Parties to, and do in fact, constitute a reasonably equivalent exchange of value.

d.    The Parties do not intend to hinder, delay, or defraud any entity to which Defendants were or became indebted to on or after the date of any transfer contemplated in this Agreement, within the meaning of 11 U.S.C. § 548(a)(1).

e.    If Defendants' obligations under this Agreement are avoided for any reason (including but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code) or if, before the Settlement Amount is paid in full, Defendants or a third party commences a case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors seeking any order for relief of Defendants' debts, or to adjudicate Defendants as bankrupt or insolvent; or seeking appointment of a receiver, trustee, custodian, or other similar official for Defendants or for all or any substantial part of Defendants' assets:

(i) the United States may rescind the releases in this Agreement and bring any civil and/or administrative claim, action, or proceeding against Defendants for the claims that would otherwise be covered by the releases provided in Paragraph 3 above;

(ii) the United States has an undisputed, noncontingent, and liquidated allowed claim against Defendants in the amount of $64,000,000 less any payments received pursuant to this Agreement, provided, however, that such payments are not otherwise avoided and recovered from the United States by Defendants, a receiver, trustee, custodian, or other similar official for Defendants; and

(iii) if any payments are avoided and recovered by Defendants, a receiver, trustee, custodian, or similar official for Defendants, Relator shall, within thirty days of written notice

24

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

from the United States to the undersigned Relator's counsel, return any portions of such payments already paid by the United States to Relator pursuant to Paragraph 2.

f.      Defendants agree that any civil and/or administrative claim, action, or proceeding brought by the United States under Paragraph 13.e is not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) because it would be an exercise of the United States' police and regulatory power.  Defendants shall not argue or otherwise contend that the United States' claim, action, or proceeding is subject to an automatic stay and, to the extent necessary, consent to relief from the automatic stay for cause under 11 U.S.C. § 362(d)(1).  Defendants waive and shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claim, action, or proceeding brought by the United States within 120 days of written notification to Defendants that the releases have been rescinded pursuant to this paragraph, except to the extent such defenses were available on May 2, 2019.

16.      This Agreement is intended to be for the benefit of the Parties only.

17.      Upon receipt of all payments described in Paragraph 1, above, the United States and Relator shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the claims filed against Defendants in the Civil Action pursuant to Rule 41(a)(1).  The Joint Stipulation shall be (i) with prejudice as to the United States' and the Relator's claims as to the Covered Conduct, and (ii) without prejudice as to the United States and with prejudice as to the Relator as to all other allegations set forth in the Civil Action, except with respect to Relator's claim against Defendants for reasonable expenses necessarily incurred and reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), which shall not be dismissed and shall remain pending.

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

18.    Except with regard to Relator's claim to its reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

19.    Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

20.    This Agreement is governed by the laws of the United States.  The exclusive venue for any dispute relating to this Agreement is the United States District Court for the Northern District of New York.  For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

21.    This Agreement constitutes the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties.  Forbearance by the United States from pursuing any remedy or relief available to it under this Agreement shall not constitute a waiver of rights under this Agreement.

22.    The undersigned individuals represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

23.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

24.    This Agreement is binding on Defendants' and the former Gill Marketing President's successors, transferees, heirs, and assigns.

25.    This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

26.    All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

27.    This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  Facsimiles of signatures and signatures in portable document format (.pdf) shall constitute acceptable, binding signatures for purposes of this Agreement.

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

FOR THE UNITED STATES OF AMERICA

Carla B. Freedman
United States Attorney
Northern District of New York

February __22__, 2022

_____
Adam J. Katz
Assistant United States Attorney

Vanessa R. Waldref
United States Attorney
Eastern District of Washington

February __22__, 2022

_____
Daniel Hugo Fruchter
Tyler Tornabene
Assistant United States Attorneys

FOR DEFENDANTS TRIMARK USA, LLC,
GILL GROUP, INC. AND TRIMARK GILL
MARKETING

February 15, 2022

_____
Robert H. Hotz
Anne W. Robinson
Latham & Watkins LLP

February 15, 2022

_____
Michael Passanisi
General Counsel
TriMark USA

FOR KIMBERLEY A. RIMSZA

February __16__, 2022

_____
Kimberley A. Rimsza

28

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

February 16 , 2022

*Jennifer A. Short*

Jennifer A. Short
Carolyn Cody-Jones
Blank Rome LLP


FOR RELATOR FOX UNLIMITED
ENTERPRISES, LLP AND ITS PARTNERS


February ___, 2022

Andrew M. Miller
Baron & Budd, P.C.
Counsel for Relator


February ___, 2022

Margaret Bullard-Marshall
Partner, Fox Unlimited Enterprises LLP

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

February ___, 2022

                                          _____

Jennifer A. Short
Carolyn Cody-Jones
Blank Rome LLP


FOR RELATOR FOX UNLIMITED
ENTERPRISES, LLP AND ITS PARTNERS

February 16, 2022

Andrew M. Miller
Baron & Budd, P.C.
Counsel for Relator


February 15, 2022

Margaret Bullard-Marshall
Partner, Fox Unlimited Enterprises LLP

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

# EXHIBIT A

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

| NAICS | |
|---|---|
| NAICS Code | NAICS Description |
| 221310 | WATER SUPPLY AND IRRIGATION SYSTEMS |
| 238220 | PLUMBING, HEATING, AND AIR-CONDITIONING CONTRACTORS |
| 238290 | OTHER BUILDING EQUIPMENT CONTRACTORS |
| 311999 | ALL OTHER MISCELLANEOUS FOOD MANUFACTURING |
| 312113 | ICE MANUFACTURING |
| 325998 | ALL OTHER MISCELLANEOUS CHEMICAL PRODUCT AND PREPARATION MANUFACTURING |
| 332215 | METAL KITCHEN COOKWARE, UTENSIL, CUTLERY, AND FLATWARE (EXCEPT PRECIOUS) MANUFACTURING |
| 332913 | PLUMBING FIXTURE FITTING AND TRIM MANUFACTURING |
| 333241 | FOOD PRODUCT MACHINERY MANUFACTURING |
| 333249 | OTHER INDUSTRIAL MACHINERY MANUFACTURING |
| 333318 | OTHER COMMERCIAL AND SERVICE INDUSTRY MACHINERY MANUFACTURING |
| 333319 | OTHER COMMERCIAL AND SERVICE INDUSTRY MACHINERY MANUFACTURING |
| 333414 | HEATING EQUIPMENT (EXCEPT WARM AIR FURNACES) MANUFACTURING |
| 333415 | AIR-CONDITIONING AND WARM AIR HEATING EQUIPMENT AND COMMERCIAL AND INDUSTRIAL REFRIGERATION EQUIPMENT MANUFACTURING |
| 333922 | CONVEYOR AND CONVEYING EQUIPMENT MANUFACTURING |
| 333994 | INDUSTRIAL PROCESS FURNACE AND OVEN MANUFACTURING |
| 333997 | SCALE AND BALANCE MANUFACTURING (2007), SCALE AND BALANCE (EXCEPT LABORATORY) MANUFACTURING (2002) |
| 333999 | ALL OTHER MISCELLANEOUS GENERAL PURPOSE MACHINERY MANUFACTURING |
| 335210 | SMALL ELECTRICAL APPLIANCE MANUFACTURING |
| 335221 | MAJOR HOUSEHOLD APPLIANCE MANUFACTURING |
| 335221 | HOUSEHOLD COOKING APPLIANCE MANUFACTURING |
| 335222 | HOUSEHOLD REFRIGERATOR AND HOME FREEZER MANUFACTURING |
| 335228 | OTHER MAJOR HOUSEHOLD APPLIANCE MANUFACTURING |
| 335999 | ALL OTHER MISCELLANEOUS ELECTRICAL EQUIPMENT AND COMPONENT MANUFACTURING |
| 337110 | WOOD KITCHEN CABINET AND COUNTERTOP MANUFACTURING |
| 423440 | OTHER COMMERCIAL EQUIPMENT MERCHANT WHOLESALERS |
| 423620 | HOUSEHOLD APPLIANCES, ELECTRIC HOUSEWARES, AND CONSUMER ELECTRONICS MERCHANT WHOLESALERS |
| 423740 | REFRIGERATION EQUIPMENT AND SUPPLIES MERCHANT WHOLESALERS |
| 423830 | INDUSTRIAL MACHINERY AND EQUIPMENT MERCHANT WHOLESALERS |
| 423840 | INDUSTRIAL SUPPLIES MERCHANT WHOLESALERS |
| 423850 | SERVICE ESTABLISHMENT EQUIPMENT AND SUPPLIES MERCHANT WHOLESALERS |
| 532490 | OTHER COMMERCIAL AND INDUSTRIAL MACHINERY AND EQUIPMENT RENTAL AND LEASING |
| 722330 | FOOD SERVICE CONTRACTORS |
| 722330 | MOBILE FOOD SERVICES |
| 722514 | CAFETERIAS, GRILL BUFFETS, AND BUFFETS |
| 811411 | HOME AND GARDEN EQUIPMENT REPAIR AND MAINTENANCE |
| 811412 | APPLIANCE REPAIR AND MAINTENANCE |

| Product or Service | |
|---|---|
| Product or Service Code | Product or Service Description |
| 3910 | CONVEYORS |
| 4110 | REFRIGERATION EQUIPMENT |
| 7220 | FLOOR COVERINGS |
| 7310 | FOOD COOKING, BAKING, AND SERVING EQUIPMENT |
| 7320 | KITCHEN EQUIPMENT AND APPLIANCES |
| 7330 | KITCHEN HAND TOOLS AND UTENSILS |
| 7340 | CUTLERY AND FLATWARE |
| 7350 | TABLEWARE |
| 7360 | SETS, KITS, OUTFITS AND MODULES, FOOD PREPERATION AND SERVING |

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

# EXHIBIT B

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA *ex rel.* FOX
UNLIMITED ENTERPRISES LLP,

                Plaintiff/Relator,

     v.

TRIMARK USA, LLC, TRIMARK GILL
GROUP, TRIMARK GILL MARKETING
F/K/A GILL MARKETING, INC.,

                Defendants.

---

Case No.  1:19-cv-914 (GLS/CFH)

## CONSENT JUDGMENT

This matter is before the Court upon the consent of the United States of America (United States), Defendants TriMark USA, LLC, TriMark Gill Group, and TriMark Gill Marketing (collectively, "Defendants"), and Relator Fox Unlimited Enterprises, LLP (collectively, "Relator").  The United States, the Defendants, and Relator are collectively referred to herein as "the Parties."

Defendants consent to entry of this judgment against it in Case No. 1:19-cv-914 (the "Civil Action").  As established by the attached Settlement Agreement, the Court finds as follows:

1.       This Court has jurisdiction over the Parties as well as over the subject matter of the Civil Actions.

2.       The Parties negotiated an agreement to resolve certain claims that the Relator filed on behalf of the United States in the Civil Action against the Defendants (the "Agreement").

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

3.      The Settlement Agreement required the Defendants to pay the United States $24,250,000, plus simple interest at the rate identified in Paragraph 1 of the Agreement, on April 30, 2022, or 30 days after Effective Date, whichever is later, followed by $24,250,000, plus interest at the rate identified in Paragraph 1, by no later than the following dates: (i) October 31, 2022 or 6 months after the Effective Date, whichever is later, (ii) December 31, 2022, or 8 months after the Effective Date, whichever is later, (iii) February 28, 2023, or 10 months after the Effective Date, whichever is later, and (iv) April 30, 2023, or 12 months after the Effective Date, whichever is later.

4.      Defendants are in Default, as defined in paragraph 12 of the Agreement, because Defendants have failed to timely meet its payment obligations.  Notice of Default has been given to Defendants and the 7-day period to cure the Default provided in the Agreement has expired.

5.      In the Agreement, Defendants agreed that if they were in Default as to its payment obligations under Paragraph 1 of the Agreement, and did not timely cure that Default, this consent judgment would be entered in favor of the United States against it for the amount set forth below.  Such a Default has occurred.

**WHEREFORE, IT IS HEREBY ORDERED** that judgment be entered in favor of the United States and against Defendants in the amount of $48,500,000, plus interest accrued thereon and less any amount previously paid by Defendants to the United States pursuant to the Agreement.  As set forth in the Agreement, interest shall accrue as follows: (a) at a rate of 3% per annum, from November 1, 2021 until and including the day prior to Default, and (b) at a rate of 12% per annum, compounded daily, from the date of Default and continuing to and including the day that Defendants make final payment under the Agreement.

34

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)

**IT IS SO ORDERED.**

Dated:_____          _____
                                       Hon. Gary L. Sharpe
                                       Senior United States District Judge

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. TriMark USA, LLC, et al.*, No. 1:19-cv-914 (N.D.N.Y.)